UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TAHER ACHAGZAI,<br><br>*Plaintiff*,<br><br>v.<br><br>BROADCASTING BOARD OF GOVERNORS,<br><br>*Defendant*. | Civil Action No. 17-612 (RDM) |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's motion to dismiss or, in the alternative, for summary judgment. Dkt. 11. Plaintiff Taher Achagzai alleges workplace discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA") and Title VII of the Civil Rights Act of 1964 ("Title VII"). He also alleges that his former employer, the Broadcasting Board of Governors ("the Board"), retaliated against him for engaging in activity protected under the ADEA. Achagzai's claims are largely duplicative of those he brought in a previous action before this Court, which were dismissed because he had failed to exhaust his administrative remedies. *See Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164 (D.D.C. 2016) ("*Achagzai I*"). Once again, Achagzai has failed to timely exhaust most of the claims that he asserts in this case. To the extent Achagzai has exhausted his administrative remedies, moreover, the Court concludes that Achagzai has failed to state a claim under Title VII. With respect to Achagzai's remaining, exhausted claims, the Court concludes that he has failed to allege facts sufficient to state a hostile work environment claim and has failed to allege an "adverse employment action" sufficient to sustain his discrimination claim, but concludes that he

has alleged a "materially adverse" action sufficient to support his retaliation claim. The Court will, accordingly, **GRANT** the Board's motion in part, and will **DENY** it in part.

## I. BACKGROUND

### A. Factual Background

The following facts are undisputed for purposes of the pending motion. From 1988 to 2016, Plaintiff Taher Achagzai worked at the Pashto Language Service, a division of Voice of America ("VOA"). Dkt. 1 at 3 (Compl. ¶ 5). Most recently, he held the position of international broadcaster. *Id.* He is a naturalized United States citizen of Afghan national origin, *id.*, and is now seventy-nine years old, Dkt. 11-3 at 3. Defendant, the Broadcasting Board of Governors, is an independent federal agency that oversees all non-military, international broadcasting sponsored by the federal government, including the VOA. Dkt. 1 at 3 (Compl. ¶ 6). Achagzai alleges that the Board "constructively discharged [him] and subjected [him] to harassment based on his age," and that he suffered "reprisal[s] for having [previously] complained to management about the harassment and discrimination by his man[a]gers." *Id.* (Compl. ¶ 4). As was the case in *Achagzai I*, "[t]he crux of the complaint is that the older, Afghan[]" employees of VOA, Achagzai included, "suffered a laundry list of workplace indignities . . . as [the] VOA attempted to . . . modernize its offerings." 170 F. Supp. 3d at 169.

Achagzai asserts four claims: discrimination under Title VII (Count 1); age discrimination in violation of the ADEA (Count 2); constructive discharge in violation of Title VII (Count 3); and unlawful retaliation "against Plaintiff because of [his] protected ADEA activities" (Count 4). Dkt. 1 at 4–7 (Compl.) In support of these claims, Achagzai raises a number of allegations. First, he alleges that the Board's management discriminated against him when, in 2015, it changed his "schedule of over 10 years" and required that he arrive at work at "7 or 7:30 or 8" a.m., knowing that he "traveled on public transport[ation]" and would therefore

need to leave for work at 5:00 a.m. "in below zero-degree weather during the months of December and January." *Id.* at 4 (Compl. ¶ 9). Working this early shift constituted an "egregious hardship" on Achagzai and, in fact, "he nearly died of a blood clot and pneumonia during the winter of 2015-2016." *Id.* (Compl. ¶ 8). This discrimination continued, according to Achagzai, when VOA management issued a new schedule in May 2016, which continued to require that he cover the "early morning" shift, even though "several other staff members, who [were] younger," were better suited for that shift. *Id.* at 4–5 (Compl. ¶ 9). To make matters worse, Achagzai continues, under "the new schedules," Achagzai was "forced . . . to work" with other employees who lacked "the necessary skills, language training and background," thus requiring the he "do the work of [three] other employees." *Id.* at 6 (Compl. ¶ 16). "If he failed to do the work of at least three . . . others," Achagzai maintains, "he was harassed." *Id.* According to Achagzai, as a result of the discriminatory schedule, he "submitted a voluntary-separation application [on April 18, 2016] pursuant to an agency-wide buyout option that had been announced on March 18, 2016," in which he "agreed to retire on or before June 30, 2016, in exchange for a severance payment." Dkt. 11-1 at 10. He claims that his retirement was, in fact, involuntary, and that the scheduling changes enacted in 2015 and 2016 "forced [him] to retire" prematurely, "before his health was irreparably harmed." Dkt. 1 at 6–7 (Compl. ¶¶ 16, 18).

At least in conclusory terms, Achagzai also mentions a variety of other allegedly discriminatory actions taken by the Board over the years. He alleges, for example, that he performed the duties of "an Editor, but was never given the promotion or paid for the work that he performed." *Id.* at 5 (Compl. ¶ 10). He alleges that, despite having "only received 'high level' performance ratings," he discovered "[s]ometime in 2010 . . . that younger employees were promot[ed] to GS[-]12 [while] he was still GS[-]11." *Id.* (Compl. ¶ 10). He alleges that he

3

was "subject[ed] . . . to conditions and terms of employment that were not enforced on younger employees" and was "treated in a manner that was different from the younger employee[s]." *Id.* (Compl. ¶ 13). He alleges that "[y]ounger employees were given shows and on air interviews and assignments that were not available to the senior staff and in particular to Mr. Achagzai" and, most notably, that "[h]is poetry show was taken from him and given to other younger and newer staff while his voice was not part of any interviews or shows or features, because of his age." *Id.* at 5–6 (Compl. ¶ 13). He alleges that this campaign of "harass[ment] and target[ing] the senior staff" was part of the transition, begun in 2010, to "the new format," a change which Achagzai suggests was really part of a plan to "replace the senior staff" with "younger employees." *Id.* at 6 (Compl. ¶¶ 13–15). And, he alleges that the actions he describes cumulatively created a hostile working environment. *Id.* at 8–9 (Compl. ¶¶ 24–25); Dkt. 11-3 at 3.

Finally, Achagzai alleges that all of the purportedly discriminatory actions described above were also in retaliation for his prior engagement in activity protected by the ADEA. *Id.* at 7 (Compl. ¶ 20). He posits that these actions were part of a "calculated and purposeful campaign of unlawful retaliation," *id.* at 7–8 (Compl. ¶ 21), and contributed to the creation of "an intimidating, hostile or offensive working environment," *id.* at 8–9 (Compl. ¶¶ 24–25).

**B.  Procedural Background**

Achagzai submitted his voluntary-separation application on April 18, 2016. Dkt. 11-1 at 10. On May 13, 2016, VOA's Director approved the buyout. *Id.* Achagzai then sought Equal Employment Opportunity ("EEO") counseling from the Board's internal Office of Civil Rights on May 18, 2016. *Id.* at 11. He filed a formal complaint of discrimination on May 22, 2016, before filing suit in this Court on April 6, 2017. *Id.* No administrative decisions were rendered prior to the commencement of this action.

In lieu of filing an answer, the Board moved to dismiss or, in the alternative, for summary judgment. Dkt. 11. Attached to its motion are Achagzai's formal complaint of discrimination, Dkt. 11-3, his responses to questions raised by the EEO office when investigating his complaint, Dkt. 11-4, his voluntary separation incentive payment application, Dkt. 11-5, and a memorandum distributed by the Board regarding the terms of the voluntary separation application process, Dkt. 11-6. Achagzai's eight-page opposition repeats the same vague claims made in his complaint. Dkt. 13-1. He attaches an excerpt from a deposition of one of his former supervisors taken in his previous case, Dkt. 13-2, and his own, fifteen-line affidavit, which asserts that he retired because he "was targeted based on [his] age." Dkt. 13-3 at 1. He has not submitted the "concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated" required by Local Civil Rule 7(h)(1), nor has he disputed the authenticity or veracity of the records from the administrative complaint process produced by the government.

## II. LEGAL STANDARD

The Board moves under Rule 12(b)(6) to dismiss for failure to state a claim upon which relief may be granted. To prevail on such a motion, a defendant must demonstrate that the facts alleged in the complaint, accepted as true, do not warrant relief. *See Harris v. Ladner,* 127 F.3d 1121, 1123 (D.C. Cir. 1997). If the Court concludes that the movant's arguments go beyond the pleadings and require consideration of facts not alleged in the complaint, the Court may either deny the motion on that ground or may, where appropriate and with reasonable notice to the parties, convert the motion to dismiss to one for summary judgment under Rule 56. *See* Fed. R. Civ. P. 12(d). When a defendant moves to dismiss for failure to state a claim on the ground that the plaintiff has failed to exhaust her administrative remedies, the Court may consider the

plaintiff's official EEO complaint and any attachments (such as the answers to questions provided in this case) without converting the motion to one for summary judgment. *See Coleman v. Duke*, 867 F.3d 204, 210 & n.4 (D.C. Cir. 2017).

In any event, the Board also moves, in the alternative, for summary judgement under Rule 56. The Court may grant summary judgment only when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where, as here, the defendant has moved for summary judgment, it "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has carried that burden, the opposing party must come forward with declarations or other evidence showing that there is a genuine issue of material dispute for the trier of fact. *Grimes v. District of Columbia*, 794 F.3d 83, 94–95 (D.C. Cir. 2015).

### III. DISCUSSION

The Board argues that Plaintiff's claims fail for four reasons. First, it argues that Achagzai has not alleged any discrimination prohibited by Title VII. Second, it argues that most of Achagzai's claims of discrete acts of discrimination and retaliation must be dismissed because he failed to exhaust his administrative remedies in a timely manner. Third, it argues that Achagzai also failed to exhaust his hostile work environment claim and that, in any event, he has failed to allege facts sufficient to state a hostile work environment claim. Fourth, the Board argues that the acts that Achagzai did timely raise in the administrative process do not constitute "adverse employment" actions for purposes of his discrimination claim and were not "materially adverse" for purpose of his retaliation claim.

A.   Title VII

Achagzai styles Count 1 of his complaint "Discrimination Under Title VII" and alleges that "Defendant intentionally discriminated against [him] based on his age, in violation of Title VII." Dkt. 1 at 4 (Compl. ¶ 7). Problematically, Title VII prohibits discrimination based only on an "individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a), and not discrimination based on age. As the Board correctly observes, moreover, "[n]owhere . . . in Mr. Achagzai's complaint does he allege anything about discrimination based on any class protected by Title VII, nor does he allege anything about retaliation for filing complaints about discrimination prohibited under Title VII." Dkt. 11-1 at 16. Instead, he merely alleges that he is "a naturalized citizen of the United States who is of Afghan origin." Dkt. 1 at 3 (Compl. ¶ 5). By any measure, that is not enough to allege a claim of discrimination on the basis of national origin. Achagzai's constructive discharge claim, contained in Count 3 of the complaint, suffers from the same flaw. It alleges that he was constructively discharged "pursuant to Title VII," Dkt. 1 at 7 (Compl. ¶ 19), and it includes no reference to the ADEA or any other antidiscrimination law. And, because the complaint fails to allege any facts that would support a claim under Title VII—for constructive discharge or otherwise—Count 3 fails to state a claim as well.

Nor do Achagzai's stray references to his national origin in his original administrative complaint and in his opposition to the pending motion cure this defect. Dkt. 11-3 at 3; Dkt. 13-1 at 6. Achagzai is represented by counsel, and "[i]t is axiomatic that a party may not amend his complaint via his briefing," *Dufur v. U.S. Parole Comm'n*, 314 F. Supp. 3d 10, 16 (D.D.C. 2018) (alterations omitted) (quoting *ACLU v. Trump*, 266 F. Supp. 3d 133, 142 n.5 (D.D.C. 2017)). To the extent the omission of any allegations relating to discrimination on the basis of national origin in the complaint was simply a drafting error or oversight, Achagzai has had months to

7

seek leave to amend his complaint, yet he has failed to do so. Under these circumstances, the Court must assume that the complaint means what it says, and it says nothing that would state a claim under Title VII.

## B. Exhaustion of Discrete Act Claims

The ADEA does not "incorporate[] a jurisdictional exhaustion requirement." *Menominee Indian Tribe of Wis. v. United States*, 614 F.3d 519, 527 (D.C. Cir. 2010). Instead, the ADEA exhaustion requirement is properly viewed as an affirmative defense, and thus "the defendant bears the burden of pleading and proving" the defense. *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997). Here, the Board has moved for summary judgment with respect to exhaustion, and it has submitted a "statement of material facts as to which there is no genuine issue," supported by citations to Achagzai's administrative complaint and a number of responses he submitted through counsel in the course of the Board's investigation of his complaint. Dkt. 11-2 (Statement of Undisputed Material Facts ("SUMF")); Dkt. 11-3 (Formal Complaint); Dkt. 11-4 (Achagzai's Responses to Follow-Up Questions). Achagzai, in turn, has failed to submit a "concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, . . . includ[ing] references to the parts of the record relied on to support the statement." Local Civil Rule 7(h)(1). Instead, he has submitted excerpts from a deposition of a manager employed by the Board taken in the previous suit he brought alleging discrimination and retaliation, Dkt. 13-2 (Mendelson Dep.), and his own fifteen-line affidavit, Dkt. 13-3 (Achagzai Aff.). Neither document disputes any fact relevant to the question of exhaustion, nor has Achagzai elsewhere called into question the authenticity or accuracy of the administrative records produced by the Board. The Court considers whether the Board is entitled to prevail on its failure-to-exhaust affirmative defense against this procedural and factual background.

Under the ADEA, a federal employee may elect to exhaust administrative remedies in one of two ways. First, the employee may "bring a claim directly to federal court . . . within 180 days of the allegedly discriminatory act," so long as the employee "provides the [Equal Employment Opportunity Commission ("EEOC")] with notice of his intent to sue at least 30 days before commencing suit." *Rann v. Chao*, 346 F.3d 192, 195 (D.C. Cir. 2003). Second, the employee may timely exhaust administrative remedies following the same procedures applicable in Title VII cases. To do so, the employee must alert an EEO counselor of any alleged discrimination within forty-five days of the relevant conduct. *See* 29 C.F.R. § 1614.105(a). If the counselor cannot resolve the issue through mediation, he or she must notify the employee of his right to file an administrative complaint, triggering a fifteen-day window in which to do so. *Id.* Any claims brought in litigation must relate to allegations of discrimination that were timely raised in the administrative process. *See Mount v. Johnson*, 36 F. Supp. 3d 74, 83 (D.D.C. 2014). When the employee alleges that he was the victim of a "discrete retaliatory or discriminatory act," the timeliness inquiry focuses on that particular act. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002). "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in [a] timely" manner in the administrative process. *Id.* at 113. A separate inquiry, discussed below, governs allegations of a hostile work environment.

Under this framework, the Court concludes that Achagzai has failed to exhaust all but two of his claims of discrete acts of discrimination or retaliation. Neither Achagzai nor the Board suggests that Achagzai followed the first approach, which would have required providing timely notice to the EEOC of his intent to sue. The Court, accordingly, considers only the second approach, which required that Achagzai exhaust the EEO process. For present purposes,

it is undisputed that he initiated that process on May 18, 2016, the date on which he first conferred with an EEO counselor. Dkt. 11-3 at 2. That means that Achagzai timely exhausted his administrative remedies only with respect to those "discrete retaliatory or discriminatory act[s]" that "occurred" within forty-five days of May 18, 2016—that is, on or after April 3, 2016. *See Morgan*, 536 U.S. at 110. Nearly all of the allegedly discriminatory actions identified in the complaint, however, occurred prior to that date. First, Achagzai refers to a schedule implemented in November 2015 that required him to "leave his home in below zero-degree weather during the months of December and January," a time period well outside the forty-five-day window. Dkt. 1 at 4 (Compl. ¶ 9); Dkt. 11-4 at 3. Second, he alleges that "[s]ometime in 2010, [he] learned that younger employees were promot[ed] to GS[-]12 and he was still GS[-]11." Dkt. 1 at 5 (Compl. ¶ 10). Achagzai was himself promoted to a GS-12 position in 2013, Dkt. 11-2 at 1 (SUMF ¶ 3), so any discrete acts of discrimination relating to the Board's failure to promote him occurred before 2013—again, well outside the forty-five-day window. Finally, Achagzai's allegations that his poetry show "was taken from him and given to other younger and newer staff," Dkt. 1 at 5 (Compl. ¶ 13), and that the imposition of the "the new format" in 2010 was intended to disfavor older employees, *id.* at 5–6 (Compl. ¶ 13), were not timely raised. The former event occurred in 2012, Dkt. 11-2 at 2 (SUMF ¶ 4), and Achagzai fails to identify any act that the Board took during the forty-five window that involved the "new format."

That leaves two allegedly discriminatory or retaliatory actions: the schedule announced in May 2016, Dkt. 11-3 at 3; *see also* Dkt. 13-3 (Achagzai Aff. ¶ 5) (describing as discriminatory or retaliatory actions only schedule changes "in December of 2015 and again in early 2016"), and what Achagzai characterizes as his constructive discharge, which occurred in June 2016, after he signed a voluntary termination agreement, Dkt. 11-5 at 2; Dkt. 1 at 6–7 (Compl. ¶ 18). To the

extent Achagzai claims that the May 2016 schedule and his voluntary separation constituted acts of discrimination or retaliation, he has timely exhausted his administrative remedies.

## C. Hostile Work Environment Claims

When an employee alleges that he was the victim of a hostile work environment, a different exhaustion rule applies. Because the "very nature" of a hostile work environment claim "involves repeated conduct," the unlawful employment practice "cannot be said to occur on any particular day." *Morgan*, 536 U.S. at 115. As a result, as long as "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117. It is essential, however, that the employee exhaust administrative remedies with respect to at least one act occurring within the time period specified in the statute or regulations for initiating the administrative process. *Id.* at 118. The relevant time period in this case is the forty-five-day window prior to Achagzai's initial EEO contact, which occurred on May 18, 2016, Dkt. 11-1 at 11; as such, his hostile work environment claim must encompass at least one action taken by the Board on or after April 3, 2018. *Morgan*, 536 U.S. at 117.

Achagzai has not satisfied this requirement. The only action that the Board allegedly took during the forty-five-day window was re-imposing a schedule that required that Achagzai arrive at work as early as 7:00 am, and assigning him to work with other employees who, according to Achagzai, were not up to the task, thus requiring that Achagzai pick up their slack. *See* Dkt. 1 at 6 (Compl. ¶ 16). Had this all taken place in December or January, the Court could understand Achagzai's contention that the Board intentionally put his health at risk by requiring that he leave for work during the frigid hours of the morning. But, for relevant purposes, the schedule was set in May, and requiring that an employee arrive at work at 7:00 a.m., along with other employees, hardly constitutes even a "component act[]" of a hostile work environment

11

claim. *Morgan*, 536 U.S. at 117. The same can be said of Achagzai's claim that he was assigned to work with unqualified co-workers, requiring that he do their work as well as his own. To be sure, a plaintiff need not show that the "component act[]" that was timely raised would, standing alone, state a claim for a hostile work environment. *Morgan*, 536 U.S. at 117. But, the timely-raised act must at least form part of a chain of events giving rise to such a claim. For the reasons explained above, the Court is not convinced that the May schedule satisfies even that modest requirement.

But, even assuming that Achagzai could clear this initial hurdle, his claim fails because he has failed to identify any action or actions sufficiently severe or pervasive to have created a hostile work environment. As this Court has previously noted, "[t]he bar for demonstrating a hostile work environment is a high one." *Achagzai I*, 170 F. Supp. 3d at 183. To prove a hostile work environment claim under Title VII, "a plaintiff must show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that [wa]s 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* (quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1191, 1201 (D.C. Cir. 2008)). Although the D.C. Circuit and Supreme Court have yet to decide whether "a hostile work environment claim can be brought under the ADEA," assuming it can be, "the same standard would apply." *Id.* (quoting *Ware v. Hyatt Corp.*, 80 F. Supp. 3d 218, 227 (D.D.C. 2015)). Here, the acts that Achagzai alleges contributed to a hostile work environment were both too isolated and insufficiently severe to state a claim. His complaint describes a salary dispute regarding a promotion in 2010, Dkt. 1 at 5 (Compl. ¶ 10), a poetry show that was reassigned in 2012, *id.* at 5–6 (Compl. ¶ 13), a schedule promulgated in 2015, *id.* at 4–5 (Compl. ¶¶ 8–9), his allegedly forced retirement in June 2016, *id.* at 3 (Compl. ¶ 5), and a schedule issued in 2016, *id.* at 4–5

12

(Compl. ¶ 9). These events, which occurred over a six-year period, are too temporally isolated and insufficiently severe to state a claim for a hostile work environment. *See Barbour v. Browner*, 181 F.3d 1342, 1348 (D.C. Cir. 1999) (holding that two incidents of discrimination over two years, supplemented with modestly harassing behavior, was insufficiently severe or pervasive to constitute a hostile work environment); *see also Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002) ("[A] few isolated incidents of offensive conduct do not amount to actionable harassment."). To be sure, the D.C. Circuit has recognized that even a single, sufficiently severe incident may suffice to create a hostile work environment, *see Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (per curiam), but the events described by Achagzai do not come close to the level of severity required to state such a claim, *contra id.* at 579–80 (collecting cases in which plaintiffs were subjected to "physical assault," "sexual assault," "racially hostile graffiti that amounted to [a] death threat," "the use of several racial epithets and insults," and "a burning cross").

The Court, accordingly, will grant the Board's motion with respect to Achagzai's hostile work environment claim.

**D.**     **Exhausted Claims Alleging Discrete Acts of Discrimination and Retaliation**

Having thus narrowed the issues in dispute, the Court turns to those claims for which Achagzai timely exhausted his administrative remedies: (1) the announcement in May 2016 of a new broadcasting schedule, which assigned him duties in the morning alongside coworkers he deemed unqualified, Dkt. 1 at 4–5 (Compl. ¶¶ 8–9), *id.* at 6 (Compl. ¶ 16); and (2) his "force[d] retire[ment]" to avoid "irreparabl[e] harm[]" to "his health," *id.* at 6 (Compl. ¶ 16). As far as the Court can discern from the complaint, these two claims are premised on a single event—the promulgation of the new schedule in May 2016, which required that Achagzai arrive at work as early as 7:00 a.m., and which required that he "do the work of" of the other employees assigned

to the same shift, who lacked the necessary skills to do the job. *Id.* at 6 (Compl. ¶ 16). The question is whether this alleged act is sufficient to state a claim for discrimination or retaliation under the ADEA. *See Taylor v. Small*, 350 F.3d 1286, 1296 (D.C. Cir. 2003).

1. *ADEA Discrimination Claim*

"[T]he two essential elements of a discrimination claim" under the ADEA "are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's . . . age . . . ." *Baloch*, 550 F.3d at 1196. In this context, "an adverse employment action [requires] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (internal quotation marks and emphasis omitted). To survive a motion to dismiss, the allegations contained in the complaint must be sufficient to allow a reasonable trier of fact to find an objective, tangible harm. *Id.* at 552–53. Although many workplace incidents may be upsetting to an employee, "not everything that makes an employee unhappy is an actionable adverse action." *Id.* at 552 (internal quotation marks omitted). Rather, to qualify as an "adverse employment action," the action must alter the terms or conditions of employment. *See Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 62 (2006).

Achagzai alleges that in the fall of 2015, the Board "changed [his] schedule of over 10 years, unnecessarily and maliciously and placed him in a schedule that was too burdensome and caused such egregious hardship to Plaintiff and his health that he nearly died of a blood clot and pneumonia during the winter of 2015-2016." Dkt. 1 at 4 (Compl. ¶ 8). He did not, however, exhaust his administrative remedies with respect to this schedule change. Dkt. 11-3 at 2. That means that, in considering whether he has alleged a sufficient "adverse employment action," the

14

Court may consider only the schedule implemented in May 2016. *See* Dkt. 11-3 at 3 (describing "[t]he new schedule of May 2016"). That schedule kept Achagzai on the morning shift, despite his previous request to be returned to the evening shift, and required Achagzai to work with "Khalil Khan, a junior employee of the Pashto service," who Achagzai alleges "d[id] not have the necessary training or language skills to do the news." *Id.* Achagzai asserts that he "was forced to edit [Khan's] . . . and [a] few others['] work," which "made it very difficult for [Achagzai], as [he] was not only doing [his] own job, but also the job of all those who were incompetent." *Id.* The question thus presented is whether either refusing to accommodate Achagzai's request to have a later shift or assigning him to work alongside less competent coworkers was a cognizably adverse action under either the standard for claims of discrimination or for claims of retaliation.

As the Board notes, a substantial body of authority within this district holds "that employees generally may not mount discrimination or retaliation claims on mere dissatisfaction with less favorable work assignments, which includes unwanted work schedules." Dkt. 11-1 at 21–22; *see also Sims v. District of Columbia*, 33 F. Supp. 3d 1, 10 (D.D.C. 2014) ("[Being] required to temporarily work midnight shifts demonstrate[s] only 'less favorable assignments,' which, as the D.C. Circuit has explained, do not rise to the level of materially adverse actions for the purposes of sustaining a retaliation claim.") (quoting *Jones v. D.C. Dep't of Corr.*, 429 F.3d 276, 281 (D.C. Cir. 2005)); *Brown v. Georgetown Univ. Hosp. Medstar Health*, 828 F. Supp. 2d 1, 9 (D.D.C. 2011) ("The mere fact that Brown might have preferred to keep her previous work schedule or that the change might have inconvenienced Brown is not sufficient to make out an adverse employment action." (citing *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999))); *Moore v. Ashcroft*, 401 F. Supp. 2d 1, 27 (D.D.C. 2005) ("Mere inconveniences and alteration of

15

job responsibilities will not rise to the level of adverse action.") (quoting *Stewart v. Evans*, 275 F.3d 1126, 1135 (D.C. Cir. 2002)); *see also Baloch*, 550 F.3d at 1197 ("[W]e have previously underscored our hesitancy to engage in 'judicial micromanagement of business practices' by second-guessing employers' decisions about 'which of several qualified employees will work on a particular assignment.'" (quoting *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1556 (D.C. Cir. 1997))). There are times, to be sure, when a change in a work assignment can constitute an adverse employment action. An allegation that the May 2016 schedule represented "the removal of [Achagzai's] supervisory responsibilities," for example, could "constitute[] adverse employment action." *Burke v. Gould*, 286 F.3d 513, 522 (D.C. Cir. 2002); *see also Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007). Here, Achagzai contends that his assignment to the early shift constituted an adverse employment action for two reasons. First, the assignment increased his work load because his co-workers were not qualified, and he was required to pick up their slack. Dkt. 13-1 at 7. Second, the assignment exacerbated his health problems. *Id.*

With respect to the first of these theories, "[c]ourts have consistently held that . . . increased workload," standing alone, does not rise to the level of "adverse employment action." *Saba v. U.S. Dep't of Agriculture*, 26 F. Supp. 3d 16, 25 (D.D.C. 2014); *see also Lester v. Natsios*, 290 F. Supp. 2d 11, 29–30 (D.D.C. 2003) (collecting cases); *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997) ("[C]hanges in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes."). Rather, to "constitute an actionable injury," an alleged disparate workload must be "accompanied by some other" allegation of an "adverse change in the terms, conditions, or privileges of employment." *Mack v. Straus*, 134 F. Supp. 2d

103, 113 (D.D.C. 2001). A plaintiff might allege, for example, that an increase in workload resulted in a "material decrease in her [hourly or effective] salary," or materially changed "her working conditions." *Lester*, 290 F. Supp. 2d at 29. Achagzai, however, makes no such allegation.

Achagzai's second theory poses a significant threshold issue. In general, the assessment of whether an action constitutes an "adverse employment action" requires on objective inquiry. The Court must ask whether the action materially altered the "terms, conditions, or privileges of" the plaintiff's "employment or . . . future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered *objectively tangible harm*." *Brown v. Brody*, 199 F.3d 446, 458 (D.C. Cir. 1999) (emphasis added), *abrogated on other grounds by Burlington N.*, 548 U.S. 53. In light of this principle, at least one decision from this Court has considered "whether ordering an employee to work in conditions where she—but only she—will suffer health problems is an adverse employment action." *Coleman-Adebayo v. Leavitt*, 326 F. Supp. 2d 132, 144 n.8 (D.D.C. 2004). Because being required to report to work between 7:00 and 8:00 a.m. is not an objectively unreasonable request, or a request that would lead a reasonable person to fear physical harm, Achagzai's allegation would seem to fall short. But, as explained in *Coleman-Adebayo*, it goes too far to ignore all consideration of the unique circumstances of the plaintiff's employment. To take one example, "assigning a wheelchair-bound employee to an office accessible only by use of a ladder and a tightrope (and thereby forcing her resignation)," if motivated by discriminatory animus, would seem to fall within the letter and spirit of the anti-discrimination laws. *Id.*

Here, however, the Court is not convinced that Achagzai has alleged enough to fall within such an exception. Almost all of the allegations in the complaint that relate to his health

17

concern the "egregious hardship" of requiring Achagzai, "who is in his mid-70s and [has been] advised by his medical doctors to [avoid] expos[ure] to extreme cold weather for a prolonged period of time," to "leave his home in below zero-degree weather during the months of December and January" to arrive a work for the early shift. Dkt. 1 at 4 (Compl. ¶¶ 8–9). Were this case about the schedule that Achagzai's supervisors implemented in the fall of 2015, then these allegations would have some bearing on the question presented. But, as explained above, Achagzai did not exhaust that claim, and thus the case is only about whether the May 2016 schedule constituted an adverse employment action. Nothing in the complaint suggests that it did. The May 2016 schedule certainly did not expose Achagzai to dangerously cold weather, and, to the extent he contends that the increased work load that came with that schedule endangered his health, the complaint fails to elucidate that theory.

More generally, the Court notes that the contention that an otherwise appropriate work assignment threatens an employee's health seems better suited to a Rehabilitation Act claim. To the extent that a plaintiff, like Achagzai, seeks to assert such a claim under the ADEA or a similar anti-discrimination law, the plaintiff must allege facts that not only establish that the assignment constitutes an adverse employment action, but must also allege that the employer intended to burden the employee "because of" the employee's age or some other protected status. As currently pled, Achagzai's complaint not only fails to allege that the May 2016 schedule constituted an adverse employment action, but it also fails to allege any facts that plausibly establish that the Board burdened Achagzai's health "because of"—rather than in spite of—his age.

2. *ADEA Retaliation Claim*

To allege an ADEA retaliation claim, a plaintiff must allege that "he . . . suffered (i) a materially adverse action (ii) because he . . . brought or threatened to bring a discrimination claim." *Baloch*, 550 F.3d at 1198. In the context of a retaliation claim, however, the "materially adverse" standard "encompass[es] a broader sweep of actions than those in a pure discrimination claim." *Id.* at 1198 n.4. Rather than require that a plaintiff allege an action that materially alters the terms or conditions of employment, a plaintiff need allege only that the action "would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington N.*, 548 U.S. at 68).

Achagzai's first theory—that the May 2016 schedule constituted a materially adverse action because it required that he "do the work of 3 other employees," Dkt. 1 at 6 (Compl. ¶ 16)—satisfies this less demanding standard. Considering a similar allegation, the D.C. Circuit held that "[a] reasonable employee might well be dissuaded from filing an EEO complaint if she thought her employer would retaliate by burying her in work." *Mogenhan v. Napolitano*, 613 F.3d 1162, 1164, 1166 (D.C. Cir. 2010) (observing that an employer had increased an employee's "workload to five to six times that of other employees"); *see also Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478 F.3d 364, 369 (D.C. Cir. 2008) ("[I]ncreas[ing] an employee's] workload and tighten[ing] her deadlines in retaliation for her seeking a reasonable accommodation . . . might suffice to defeat summary judgment on a retaliation claim."), *abrogated on other grounds by Green v. Brennan*, 136 S. Ct. 1769 (2016). The Court, accordingly, concludes that Achagzai has alleged an adverse action sufficient to overcome the Board's motion to dismiss with respect to his retaliation claim under the ADEA.

That, then, leaves the question whether Achagzai has alleged facts sufficient to state a "plausible" claim, *Iqbal v. Ashcroft*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)), that the Board assigned Achagzai to the early shift "because" he brought or threatened to bring a discrimination claim against the Board. Because the Board's motion to dismiss focuses exclusively on the "adverse action" requirement and does not address the separate requirement of causation, the Court will not reach that question. *C.f. Mohmand v. Broad. Bd. of Governors*, No. 17-cv-618, slip op. at 12–13 (D.D.C. Sept. 30, 2018) (granting Defendants' motion to dismiss, or, in the alternative, for summary judgment, based on similar facts, when Defendants correctly argued that Plaintiff failed to show causation). Ultimately, however, Achagzai will need to identify evidence sufficient to permit a reasonable inference that the schedule was adopted in retaliation for Achagzai's protected activity. Based on the briefing to date, however, the Court will deny the Board's motion to dismiss Achagzai's retaliation claim without prejudice.

## IV. CONCLUSION

For these reasons, the Board's motion to dismiss, or in the alternative, for summary judgment is **GRANTED** in part and **DENIED** in part. With respect to the narrow issue of whether the May 2016 schedule constituted an act of retaliation, Achagzai's suit may proceed.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: September 30, 2018

20