UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TAHER M. ACHAGZAI, *Plaintiff*, v. BROADCASTING BOARD OF GOVERNORS, *Defendant*. | Civil Action No. 17-612 (RDM) |

## MEMORANDUM OPINION

This matter is before the Court on Defendant's motion for summary judgment. Dkt. 25. Plaintiff Taher Achagzai brought this action against the Broadcasting Board of Governors ("Board")—since renamed the U.S. Agency for Global Media, Dkt. 25-1 at 6—alleging workplace discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), and retaliation for engaging in protected activity in violation of the ADEA, Dkt. 1 at 3–9 (Compl. ¶¶ 7–26). Earlier in this litigation, the Board moved to dismiss or, in the alternative, for summary judgment, arguing that Plaintiff's claims were either not exhausted or that he had failed to state a claim. Dkt. 11-1. In response, the Court dismissed all but one of Plaintiff's claims. Dkt. 16.

The Board now moves for summary judgment on the remaining claim, which alleges that it retaliated against Plaintiff for engaging in protected Equal Employment Opportunity ("EEO") activity by assigning him to serve as the morning copy editor in May 2016. Plaintiff's claim fails, according to the Board, because (1) he failed to timely exhaust his administrative remedies;

1

(2) the undisputed evidence shows that the May 2016 assignment was not a materially adverse action; and (3) the undisputed evidence shows that the Board assigned him to serve as the morning copy editor for legitimate, nonretaliatory reasons.

As explained below, the Court agrees that the Board is entitled to summary judgment for a combination of these reasons: Plaintiff was first assigned to serve as the morning copy editor in August 2015 (or the fall of 2015) but did not seek EEO counseling until May 18, 2016. Thus, to the extent he alleges that the Board retaliated against him when it initially moved him to the morning shift, he failed to initiate the EEO process within 45 days with respect to those allegations. Plaintiff did, however, timely exhaust his claim that his reassignment to the morning shift in May 2016 was retaliatory. But, as to that claim, the undisputed evidence shows that Plaintiff's only objection was that he had to arrive at work by 7:30 or 8:00 a.m. and did not like working the morning shift during the months of December, January, and February because he had to wait for the bus very early in the morning, when the temperatures were very cold. Dkt. 27-3 at 10 (Pl.'s Resp. to SUMF ¶¶ 9–10). Significantly, Plaintiff had no difficulty arriving at work for the morning shift during the month of May, when the weather was warmer. *Id.* at 11 (Pl.'s Resp. to SUMF ¶ 12). Under these circumstances, no reasonable jury could find that his reassignment in May constituted an adverse action or that the Board's real reason for making the reassignment was to retaliate against Plaintiff for engaging in protected EEO activity.

The Court will, accordingly, **GRANT** the Board's motion for summary judgment.

## I.   BACKGROUND

### A.   Factual Background

For purposes of resolving the pending motion for summary judgment, the Court relies on the undisputed facts and, to the extent the facts are disputed, accepts Plaintiff's version of the relevant events. *See Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016).

Plaintiff Taher M. Achagzai is over eighty years old and had worked at Voice of America ("VOA") in the Afghan Service, a Pashto-language radio service, for nearly thirty years prior to the termination of his employment in 2016. Dkt. 27-3 at 5–6 (Pl.'s Resp. to SUMF ¶¶ 1–4); Dkt. 11-5; Dkt. 27-2 at 1 (Achagzai Decl. ¶ 1). Plaintiff started at VOA in 1988 as a contractor and became a full-time employee in 2001. Dkt. 27-3 at 6 (Pl.'s Resp. to SUMF ¶ 3). Immediately prior to his departure from VOA, Plaintiff was an international broadcaster at the GS-12 level and was assigned the role of copy editor. Dkt. 27-3 at 5, 9–10 (Pl.'s Resp. to SUMF ¶¶ 1, 8). The Board oversees VOA, which broadcasts government-sponsored news around the world. Dkt. 27-3 at 5 (Pl.'s Resp. to SUMF ¶ 1).

In May 2014, Achagzai brought suit against the Board, alleging claims under the ADEA and Title VII. *Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 168 (D.D.C. 2016) ("*Achagzai I*"). Among the "37 categories of discriminatory conduct" listed in the complaint, Achagzai, along with his co-plaintiffs, alleged "unfair and unannounced workplace scheduling, frequent downgrades in assignments," and "favoritism shown toward junior staff in all facets of work." *Id.* at 169. The Court dismissed Achagzai's claims on March 18, 2016 for failure to timely exhaust his administrative remedies with respect to his discrimination and retaliation claims. *Id.* at 179.

After initiating the 2014 suit, Achagzai continued to work at VOA in the Afghan Service. Dkt. 27-3 at 5–6 (Pl.'s Resp. to SUMF ¶¶ 1–4). The Afghan Service broadcasts news reports from the central office of the VOA. *Id.* at 11 (Pl.'s Resp. to SUMF ¶ 15). As a copy editor, Achagzai reviewed translations of the to-be-broadcasted materials from English to Pashto before they were aired. *Id.* at 12 (Pl.'s Resp. to SUMF ¶ 16). About once or twice a year, the work schedules at the Afghan Service were updated, and employees could be assigned to different shifts. *Id.* at 7 (Pl.'s Resp. to SUMF ¶ 6). In August of 2015 (or the fall of 2015), Plaintiff was reassigned from the evening shift to the morning shift, which required him (at least initially) to arrive at work by 7:00 a.m. each day. Dkt. 27-2 at 2–3 (Achagzai Decl. ¶ 8). Plaintiff complained to his manager about the reassignment, explaining that "it was too early for [him] to take public transportation from [his] home;" that he "would need to leave [his] home at about 5:00 am to catch the bus to the metro, and transfer to another station to get to DC on time;" and "that the very cold weather was not good for [his] health." *Id.* Plaintiff asked to be assigned to a different shift, but his manager denied that request. *Id.* Eventually, Plaintiff contracted pneumonia and, when he returned to work, his manager permitted him to arrive at work an hour later than previously required. *Id.* That accommodation, however, did not entirely address Plaintiff's concerns because he had less time to complete his editing before the show began at 9:30 a.m. and thus had to work under greater pressure. *Id.* at 3 (Achagzai Decl. ¶ 9).

Despite Plaintiff's complaints about working the morning shift, when the schedule was reset in May 2016, Plaintiff was again assigned to the morning shift, which required that he arrive at work by 7:30 or 8:00 a.m. each day. Dkt. 25-2 at 2 (SUMF ¶ 9); Dkt. 27-3 at 10 (Pl.'s Resp. to SUMF ¶ 9). Plaintiff's only objection to the May 2016 schedule was that he had to work in the morning, Dkt. 25-2 at 2 (SUMF ¶ 9); Dkt. 27-3 at 10 (Pl.'s Resp. to SUMF ¶ 9), but

4

he acknowledges that he "had no difficulty whatsoever arriving at the office for the morning shift" in "May, when the weather was warmer," Dkt. 25-2 at 3 (SUMF ¶ 12); Dkt. 27-3 at 11 (Pl.'s Resp. to SUMF ¶ 12). Plaintiff also acknowledges that he "was well-suited to perform the duties of copy editor and indeed was one of (if not the most) qualified broadcaster on staff to carry out those assignments." Dkt. 25-2 at 4 (SUMF ¶ 17); Dkt. 27-3 at 12 (Pl.'s Resp. to SUMF ¶ 17). Because of the time difference, the 9:30 a.m. news broadcast to which Plaintiff was assigned aired in the evening in Afghanistan. Dkt. 25-3 (Achgazai Dep. 6:20–7:4).

On April 19, 2016, Achagzai left VOA after signing a Voluntary Separation Incentive Payment ("VSIP") agreement, which was approved by VOA's director on May 13, 2016. Dkt. 27-3 at 6 (Pl.'s Resp. to SUMF ¶ 4); Dkt. 11-5. Plaintiff asserts that, despite the agreement's name, his departure from VOA was an involuntary, constructive discharge, caused by the age discrimination and retaliation that he experienced. Dkt. 27-3 at 6 (Pl.'s Resp. to SUMF ¶ 4); Dkt. 27-1 at 2–3; Dkt. 27-2 at 1 (Achagzai Decl. ¶ 2). Before retiring from VOA in June 2016, Dkt. 27-2 at 1 (Achagzai Decl. ¶ 4), Plaintiff initiated EEO counseling on May 18, 2016, and then filed an administrative complaint of discrimination with that office on May 22, 2016, Dkt. 27-3 at 13 (Pl.'s Resp. to SUMF ¶ 20); Dkt. 11-3 at 2.

**B.      Procedural Background**

On April 6, 2017, Plaintiff filed this suit against the Board, asserting claims for both age discrimination and retaliation under the ADEA, and for other employment discrimination under Title VII. Dkt. 1. Among other things, Plaintiff alleged that "his poetry show was taken from him and given to other younger and newer staff," *id*. at 5 (Compl. ¶ 13); that he was told he was a "'man of the 60s and 70s' and not able to work on the same level as other younger employees," *id.* at 6 (Compl. ¶ 13); and that this was all a part of the "new format" enacted in 2010, *id.*, which

5

he alleges in general terms allowed "younger employees [to] replace the senior staff," *id.* at 6 (Compl. ¶ 14). Plaintiff further alleged that management retaliated against him after he complained to them about the alleged age discrimination and filed a prior suit against the Board in which his managers were deposed. Dkt. 25-7 at 8–9; *see Achagzai I*. In particular, Plaintiff claimed that his reassignment to the morning shift in August 2015 (or the fall of 2015) was motivated both by age discrimination and retaliatory animus. Dkt. 1 at 4, 6 (Compl. ¶¶ 8–9, 16).

In August 2017, the Board moved to dismiss, or, in the alternative, for summary judgment, arguing that Plaintiff had not stated a claim for discrimination based on a class protected by Title VII and that he had not properly exhausted his administrative remedies with respect to his ADEA claims. Dkt. 11. The Court granted that motion in part and dismissed Plaintiff's Title VII claims and his ADEA claims that were based on conduct that occurred more than 45 days before he initiated EEO counseling. Dkt. 16 at 8, 10–11. The Court also concluded that Plaintiff had failed to allege facts sufficient to state a hostile work environment or a discrimination claim under the ADEA. *Id.* at 1, 13, 17–18.

Thus, all that remained of Plaintiff's case was a retaliation claim under the ADEA based on his reassignment to work the morning shift. *Id.* at 19–20. With respect to that claim, the Court held as follows: (1) "[t]o the extent that [Plaintiff] claim[ed] that the May 2016 schedule and his voluntary separation constituted acts of . . . retaliation, he ha[d] timely exhausted his administrative remedies," *id.* at 10–11; (2) "th[o]se two claims [were] premised on a single event—the promulgation of the new schedule in May 2016, which required that [Plaintiff] arrive at work as early as 7:00 a.m., and which required that he 'do the work of' [three] other employees assigned to the same shift, who lacked the necessary skills to do the job," *id*. at 13–14; and (3) Plaintiff adequately alleged that he was subjected to an adverse action because the

6


May 2016 schedule allegedly required that he "'do the work of [three] other employees,'" *id*. at 19, and because he Board did not otherwise "question whether [Plaintiff] ha[d] alleged facts sufficient to state a 'plausible' claim," *id.* at 20.  The Court accordingly granted the Board's motion to dismiss, except to the extent Plaintiff alleged that "the May 2016 schedule constituted an act of retaliation."  *Id.*

The Board answered the complaint on October 15, 2018, Dkt. 17, and the Court set a discovery schedule, Minute Entry (Nov. 27, 2018), which the Court subsequently extended on multiple occasions, Minute Order (Feb. 27, 2019); Minute Order (May 20, 2019).  The Board's motion for summary judgment on the sole remaining claim is now before the Court.  Dkt. 25.

## II.  LEGAL STANDARD

A party is entitled to summary judgment under Federal Rule of Civil Procedure 56 if it can "show[] that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility of . . . identifying those portions of" the record that "demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is "material" if it could affect the substantive outcome of the litigation.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  The Court must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor.  *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

If the moving party carries this initial burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving

party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quotation mark omitted)).  The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials, and must be supported by affidavits, declarations, or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(c); *see Celotex*, 477 U.S. at 323–24.  That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to find in his favor.  *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment.  *Liberty Lobby*, 477 U.S. at 249–50.

### III.  DISCUSSION

The Board contends that it is entitled to summary judgment because: (1) the record now shows that Plaintiff did not exhaust his administrative remedies with respect to the morning schedule; (2) the May 2016 schedule did not constitute a materially adverse action; and (3) Plaintiff cannot show that the Board assigned Plaintiff to the morning shift in May 2016 in retaliation for his protected EEO activity.  Dkt. 25-1 at 6.  Based on a combination of these contentions, the Court concludes that the Board is entitled to summary judgment on Plaintiff's sole remaining claim.

**A.**     **Exhaustion**

Federal employees who sue their employers for retaliation or discrimination under the ADEA must timely exhaust their administrative remedies prior to filing suit.  29 U.S.C § 633a(b)–(d); *see also Wash. v. Wash. Metro. Area Transit Auth.*, 160 F.3d 750, 752 (D.C. Cir.

1998). As discussed at greater length in the Court's prior opinion in this case, Dkt. 16 at 8–9, a federal employee seeking to bring a claim under the ADEA may elect to exhaust administrative remedies in one of two ways: the employee may (1) "bring a claim directly to federal court . . . within 180 days of the allegedly discriminatory act," so long as the employee "provides the [Equal Employment Opportunity Commission ("EEOC")] with notice of his intent to sue at least 30 days before commencing suit," *Rann v. Chao*, 346 F.3d 192, 195 (D.C. Cir. 2003), or (2) timely exhaust administrative remedies by following the same procedures applicable in Title VII cases, Dkt. 16 at 9. Here, Plaintiff elected to follow the second of these approaches, which required that he initiate the EEO counseling process within forty-five days of the relevant conduct. *See* 29 C.F.R. § 1614.105(a). Because Plaintiff did not initiate the EEO counseling process until May 18, 2016, he did not timely exhaust administrative remedies with respect to any discrete acts of retaliation occurring before April 3, 2016—that is, forty-five days prior to May 18, 2016. Dkt. 27-3 at 13 (Pl.'s Resp. to SUMF ¶ 20); *see also* 29 C.F.R. § 1614.604(d).

It follows that Plaintiff cannot now pursue a claim of retaliation relating to his initial assignment to the morning shift in 2015 or to the continuation of that assignment through the winter of 2015–2016. Dkt. 25-3 (Achagzai Dep. 32:24–34:23). Plaintiff can, however, pursue his claim that the Board unlawfully retaliated against him for engaging in protected EEO activity when it renewed the schedule in May 2016. Dkt. 27-1 at 12–14. Because Plaintiff timely exhausted his challenge to the May 2016 schedule, the Court must now evaluate the merits of that challenge.

To do so, the Court applies the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). Under that framework, the plaintiff bears the initial burden of establishing a prima

9

facie case of retaliation, which requires showing "that (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action by her employer; and (3) a causal connection exist[s] between the two." *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007). Once the prima facie case is made out, the burden then shifts to the defendant to articulate a legitimate, non-retaliatory explanation for its actions. *See Smith v. D.C.*, 430 F.3d 450, 455 (D.C. Cir. 2005). If the defendant does so, the Court must then determine "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-[retaliatory] reason was not the actual reason and that the employer [retaliated] against the plaintiff." *Adeyemi v. D.C.*, 525 F.3d 1222, 1226 (D.C. Cir. 2008); *see also Smith*, 430 F.3d at 455; *Barnabas v. Bd. of Trustees of Univ. of D.C.*, 686 F. Supp. 2d 95, 101 (D.D.C. 2010). In other words, "once the employer asserts a legitimate, non[retaliatory] reason, the question whether the employee actually made out a prima facie case is no longer relevant and thus disappears and drops out of the picture." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (quotation marks and brackets omitted). "The only question that remains is whether the evidence creates a material dispute on the ultimate issue"—that is, whether employer retaliated against employee. *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016).

Here, the Board argues that Plaintiff has failed to establish a prima facie case of retaliation because no reasonable jury could find that subjecting Plaintiff to the May 2016 schedule constituted a materially adverse action.[1] In the alternative, the Board argues that even

---

[1] The Board does not contest that Plaintiff engaged in a protected activity by "threaten[ing] to bring a discrimination claim against the Board." Dkt. 16 at 20. Nor does the Board make any argument related to causation, at least insofar as Plaintiff's prima facie case is concerned. *See generally* Dkt. 25-1 at 5–11.

if the May 2016 schedule did constitute a materially adverse action, no reasonable jury could find that the Board's stated rationale for imposing the schedule—that Plaintiff was well-qualified to perform the assigned role—was pretextual (*i.e.*, that the real reason for the Board's action was to retaliate against Plaintiff for engaging in protected EEO activity).

The Court addresses each of these arguments in turn.

**B.     Adverse Action**

An employment action qualifies as "materially adverse" for purposes of a retaliation claim under the ADEA if the action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation marks omitted); *see also Taylor v. Solis*, 571 F.3d 1313, 1320 (D.C. Cir. 2009); *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006); *Kangethe v. D.C.*, 281 F. Supp. 3d 37, 42 (D.D.C. 2017). To be sure, "not everything that makes an employee unhappy is an actionable adverse action." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001). "Employer actions regarding assignments or duties that are temporary in nature and not accompanied by economic consequences," for example, "are rarely cognizably adverse." *Achagzai v. Broad. Bd. of Governors*, 308 F. Supp. 3d 396, 409 (D.D.C. 2018). Similarly, "[p]urely subjective injuries, such as dissatisfaction with a reassignment, are not adverse actions" either. *Bolden v. Clinton*, 847 F. Supp. 2d 28, 40 (D.D.C. 2012); *see also Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006); Dkt. 16 at 15 ("[A] substantial body of authority within this district holds that employees generally may not mount discrimination or retaliation claims on mere dissatisfaction with less favorable work assignments, which includes unwanted work schedules." (quotation marks omitted)).

11

Here, Plaintiff asserts that his assignment to serve as the morning copy editor in May 2016 constituted an adverse employment action cognizable under the ADEA. Dkt. 27-1 at 13. He offers two reasons why: First, he contends that the schedule required him to work in the mornings, Dkt. 27-3 at 10 (Pl.'s Resp. to SUMF ¶ 9); and second, he argues that the schedule increased his workload, Dkt. 27-1 at 20–21. Neither contention suffices.

To start, beyond a purportedly increased workload, Plaintiff identifies no consequence—tangible, economic, or otherwise—that flowed from his being required to work in the mornings in May 2016. Unlike in December, January, or February, when the early morning schedule required Plaintiff to "force[] [his] way through the bitter cold . . . to get to work," Dkt. 27-2 at 2–3 (Achagzai Decl. ¶ 8), "during the month of May, when the weather was warmer, [Plaintiff] had no difficulty whatsoever arriving at the office for his morning shift," Dkt. 27-3 at 11 (Pl.'s Resp. to SUMF ¶ 12). While Plaintiff may nonetheless have preferred to work a later shift, this Circuit's precedents make clear that the Board's refusal to yield to that preference does not, standing alone, constitute a material adverse action. *See, e.g.*, *Achagzai*, 2018 WL 4705799, at *7 (collecting cases).[2]

---

[2] Although Plaintiff does not squarely present the argument, the Court further concludes that no reasonable jury could find that the Board retaliated against Plaintiff by assigning him to the morning shift in May 2016 in order subject him to freezing temperatures during his commute the following winter. Accepting such an argument would require the Court to tolerate a series of assumptions that the record does not support—namely, and at a minimum, that the May schedule would remain in place for more than eight months; that Plaintiff would not retire (of his own accord) before then; that the Board planned ahead, leaving the schedule in place during the warmer months to obscure its scheme to punish Plaintiff by subjecting him to an early morning (and bitterly cold) commute in January and February 2017; and that the Board did this at the same time that it agreed to adjust Plaintiff's schedule to allow him to arrive an hour later than usually required to accommodate his long commute and health. No reasonable jury could rest a finding of adverse action on such a "speculative chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013); *see also Dage v. Johnson*, 537 F. Supp. 2d 43, 62 (D.D.C. 2008) (Plaintiff's "subjective anxiety . . . felt due to his fear . . . that [his employer] might deny him a reasonable accommodation in the future" was too "speculative[]" and "subjective" to constitute

Plaintiff's second argument that the May 2016 schedule increased his workload presents a closer question but ultimately fares no better. As this Court explained in its earlier opinion, "'[a] reasonable employee might well be dissuaded from filing an EEO complaint if she thought her employer would retaliate by burying her in work.'" Dkt. 16 at 19 (quoting *Mogenhan v. Napolitano*, 613 F.3d 1162, 1166 (D.C. Cir. 2010)). Although Plaintiff asserts here that his workload "doubled" as a result of his May 2016 reassignment, Dkt. 27-2 at 4 (Achagzai Decl. ¶ 11), that conclusory assertion is belied by the record for several reasons. For one, Plaintiff admits that only "[p]art of [his] increased workload" can be traced to the actions of the Board. *Id.* at 3 (Achagzai Decl. ¶ 10). That is because the increase in Plaintiff's workload was caused by both *his* decision to come to work an hour later than the morning schedule allowed as well as the Board's decision to assign Plaintiff to work with colleagues that, Plaintiff claims, had "very poor Pashto language skills" and whose "translations had to essentially be rewritten by [Plaintiff]." *Id.* For another, Plaintiff elsewhere acknowledges that his workload remained constant after the May 2016 reassignment. He states, for example, that he continued working standard eight-hour shifts even after the reassignment and that, on occasion, he would have "no specific duties" after lunch (that is, roughly halfway through his shift). Dkt. 27-3 at 12 (Pl.'s Resp. to SUMF ¶ 19). Most importantly, Plaintiff conceded at his deposition that his "*only*

---

materially adverse employment action); *Dickerson v. SecTek, Inc.*, 238 F. Supp. 2d 66, 75 (D.D.C. 2002) (no adverse action in gender discrimination case where plaintiff's "only harm, if any, was physiological—the stress that she endured when faced with the prospect of losing her position"). The Court acknowledges that Plaintiff was "told . . . that [the May 2016 schedule] was final, and that there was not going to be any more changes." Dkt. 27-2 at 2 (Achagzai Decl. ¶ 14). But that assertion cannot reasonably be understood to mean that the schedule was fixed for all time—or even that it would necessarily continue into the winter—but just that Plaintiff's manager was unwilling to rethink the May schedule in light of Plaintiff's objections. This conclusion is reinforced by the undisputed fact that shift reassignments were made at least once or twice every year. Dkt. 27-3 at 7 (Pl.'s Resp. to SUMF ¶ 6).

objection" to the May 2016 schedule was that it made his commute—not his workload—more difficult. Dkt. 25-3 (Achagzai Dep. 38:2–40:4) (emphasis added); *see also* Dkt. 27-3 at 10 (Pl.'s Resp. to SUMF ¶ 9–10).

Consequently, based on the record as a whole, and mindful that the facts must be viewed in the light most favorable to Plaintiff, the Court concludes that no reasonable jury could find that Plaintiff's increased workload constituted a material adverse action. *See Mogenhan*, 613 F.3d at 1166 (finding material adverse action where defendant "increased [plaintiff's] workload to *five to six times* that of other employees" (emphasis added)). As a result, Plaintiff has failed to make out a prima facie case of retaliation, which in turn provides a sufficient basis alone to grant the Board's motion for summary judgment.

## C.    Employer Rationale and Pretext

The Board is also entitled to summary judgment for a second reason: even if the May 2016 schedule qualified as a materially adverse action, no reasonable jury could find that the Board imposed that schedule to retaliate against Plaintiff.

Recall that under the burden-shifting framework of *McDonnell Douglas*, after the plaintiff makes out a prima facie case, the employer must offer a legitimate, non-retaliatory explanation for its actions. *See Smith*, 430 F.3d at 455. Here, the Board asserts that Plaintiff was assigned to serve as the early morning copy editor "because he was skilled at copy editing and because his excellent fulfillment of those responsibilities benefited the [broadcasting] service." Dkt. 25-1 at 16; *see also* Dkt. 25-2 at 4 (SUMF ¶ 18); Dkt. 27-3 at 12 (Pl.'s Resp. to SUMF ¶ 17) (Plaintiff agreeing that he "was one of (if not the most) qualified broadcaster on staff to carry out" "the duties of copy editor"). Moreover, because of the time difference, the morning shift produced news that was broadcast in Afghanistan in the middle of the evening. Dkt. 25-3

(Achagzai Dep. 6:20–7:13). The Board's explanation for Plaintiff's reassignment is thus both legitimate and non-retaliatory—employers routinely (and permissibly) make assignment decisions based on their employees' qualifications. *See, e.g.*, *Mount v. Johnson*, 174 F. Supp. 3d 553, 562 (D.D.C.), *aff'd*, 664 F. App'x 11 (D.C. Cir. 2016); *Francis v. D.C.*, 731 F. Supp. 2d 56, 80 (D.D.C. 2010); *Gonzales v. Holder*, 656 F. Supp. 2d 141, 145 (D.D.C. 2009); *Davis v. D.C.*, 503 F. Supp. 2d 104, 129 (D.D.C. 2007).

This then, puts the burden back on Plaintiff: He must rebut the legitimacy of the Board's explanation by pointing to evidence of pretext. *See Adeyemi*, 525 F.3d at 1226. He has not done so and, indeed, offers no evidence at all—either direct or circumstantial—even suggesting that he was reassigned for any reason other than his talent as a copy editor. In short, there is simply nothing in the record that undermines or provides reason to doubt the Board's explanation for Plaintiff's assignment to the early morning shift in May 2016. "This alone dooms [Plaintiff's] claim." *Turner v. Wash. Metro. Area Transit Auth.*, 2011 WL 13266591, at *8 (D.D.C. Nov. 21, 2011), *aff'd*, 534 F. App'x 2 (D.C. Cir. 2013).

The nature of Plaintiff's reassignment underscores that conclusion. Requiring an employee to arrive at work between 7:30 and 8:00 a.m. is, in the usual course, an unobjectionable practice. And this case presents the usual course. The weather in May 2016 (and that for the next several months) posed no problem for Plaintiff, who acknowledges that he "had no difficulty whatsoever arriving at the office for his morning shift" at that time of the year. Dkt. 27-3 at 11 (Pl.'s Resp. to SUMF ¶ 12). By that time, moreover, the Board had agreed (perhaps belatedly from Plaintiff's perspective, but that is of no moment for the present suit) to accommodate Plaintiff's concern about the early-morning schedule by permitting him to "arrive in the office one hour later than the other broadcasters." Dkt. 27-3 at 10 (Pl.'s Resp. to SUMF

¶ 11); *see also supra* n.2.  It would constitute a strange form of retaliation indeed to assign a top-quality employee to do an important job during an important shift, Dkt. 25-2 at 2, 4 (SUMF ¶¶ 7, 18), all while keeping the employee's work hours constant, permitting the employee to arrive an hour later than scheduled, and leaving him with "no specific duties" halfway through his shift, Dkt. 27-3 at 12 (Pl.'s Resp. to SUMF ¶ 19).

In sum, then, Plaintiff's inability to point to any evidence of retaliation or pretext, alongside the quotidian nature of his reassignment, leads the Court to conclude that no reasonable jury could find that the Board's legitimate, non-retaliatory explanation for Plaintiff's assignment to the May 2016 schedule was pretextual and that, in truth, the Board adopted the May 2016 schedule to retaliate against Plaintiff for engaging in protected EEO activity.

## CONCLUSION

For the foregoing reasons, the Court will **GRANT** the Board's motion for summary judgment, Dkt. 25.

A separate order will issue.

/s/ Randolph D. Moss  
RANDOLPH D. MOSS  
United States District Judge

Date:  September 14, 2020